IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA,    ) | |
|                        ) | |
|        v.                ) | |
|                        ) | |
| WILLIE RAYNOR,             ) | Criminal No. 3:13mj221 |
| LESTER T. JONES,          ) | Criminal No. 3:13mj215 |
|      Defendants.      ) | |

## MEMORANDUM OPINION

Defendants Willie Raynor (3:13mj221) and Lester T. Jones (3:13mj215) appear before

the Court after being charged on different occasions by the same police officer, Fort Lee Officer

Albert Purdy, with Failure to Maintain a Single Lane of Traffic in violation of the Code of

Virginia § 46.2-804 and Driving Under the Influence (DUI) in violation of the Code of Virginia

§ 18.2-266(ii).[1] Defendants, both African-American men, allege that Officer Purdy stopped their

vehicles and arrested them for traffic violations due to their race. In support of their allegations,

both Defendants have filed Requests for Discovery "Defs.' Req. for Disc." (Raynor ECF No. 21;

Jones ECF No. 12)[2] and have sought an evidentiary hearing and dismissal of their charges in

their respective Motions to Dismiss "Defs.' Mot. to Dismiss" (Raynor ECF No. 14; Jones ECF

No. 8) in which they allege violations of their Equal Protection rights. Because Defendants

raised the same issues, the Court consolidated the cases for resolution of these motions and heard

---

[1]     Both defendants have consented to this Court's jurisdiction pursuant to 18 U.S.C.
§ 3401(b) and 28 U.S.C. § 636(a)(3), (5).

[2]     In their Motions for Discovery, Defendants seek discovery relating to all traffic stops and
arrests made by Officer Purdy during his time assigned to Fort Lee, records from all traffic stops
on Route 36 in the past, including the races of those drivers stopped, and video and audio
recordings of Officer Purdy's traffic stops. (Defs.' Req. for Disc. at 1.)

oral argument on October 4, 2013.

Defendants' motions raise serious issues. It should go unsaid that race must play no role in the enforcement of the criminal laws. However, defendants must support their allegations with more than flawed statistics and hyperbole to warrant the relief that Defendants seek. Here, Defendants have utterly failed to meet their weighty burden to warrant an evidentiary hearing or production of the voluminous discovery that they seek. An examination of the evidence tendered to the Court indicates that Officer Purdy stopped Defendants not based on their race, but because they were driving while extremely intoxicated — Raynor nearly three times the legal limit and Jones more than twice the legal limit — and both nearly struck cars driving in adjacent lanes.[3] And at all times during the stops, Officer Purdy treated both defendants with the utmost professionalism, which defense counsel acknowledged during oral argument. Therefore, for the reasons that follow, the Court DENIES Defendants' motions.[4]

## I. Background

The Government submitted a videotape without audio from a dashboard-mounted video camera of the stop of Defendant Raynor (Government's Raynor Resp. (ECF No. 22) Ex. 1 "Raynor Video"), along with all of the radio traffic related to the stop of his vehicle. (Government's Raynor Resp. (ECF No. 22) Ex. 2 "Raynor Radio Traffic.") For the stop of Defendant Jones, the Government submitted a videotape with audio from the dashboard-mounted

---

[3]     The significant dangers associated with drunk driving and the resulting need for vigilant enforcement of the drunk driving laws are well-known. As the Supreme Court recently noted: "No one can seriously dispute the magnitude of the drunken driving problem or the States' interest in eradicating it. Certainly we do not. While some progress has been made, drunk driving continues to exact a terrible toll on our society." *Missouri v. McNeely*, 133 S. Ct. 1552, 1565 (Apr. 17, 2013) (citations omitted) (internal quotation marks omitted).

[4]     The Court also DENIES as moot the Government's Motion for Discovery from Defense Expert and Request for Evidentiary Hearing (Raynor ECF No. 26; Jones ECF No. 17).

video camera (Government's Jones Resp. (ECF No. 13) Ex. 1 "Jones Video"), along with all of the radio traffic related to the stop of Jones's vehicle. (Government's Jones Resp. (ECF No. 13) Ex. 2.) Based on the evidence tendered by the Government, which Defendants have not challenged at this stage, the Court determines the factual background for the two cases to be as follows.

A. Willie J. Raynor

On April 21, 2013, Officer Purdy was on duty and traveling westbound on Route 36 near Fort Lee, Virginia.[5] At the time of the incident, Officer Purdy's vehicle contained a dashboard-mounted video camera.[6] (Raynor Video.) The video for this incident began shortly after 9:10 p.m. and depicts Officer Purdy driving behind Defendant Raynor in the left-hand lane of Route 36 traveling westbound. (Raynor Video at 21:10:10.) Notably, no adverse road or weather conditions appear on the video. (Raynor Video at 21:10:10.) Further, one cannot determine the race of the driver due in large part to a toolbox and a ladder in the back of Defendant Raynor's vehicle that blocked the view of the interior of his vehicle. (Raynor Video at 21:10:10.) Indeed, after Officer Purdy stopped Defendant Raynor's vehicle, a passenger emerged from the truck, who could not be seen on the video until he stepped out of the vehicle. (Raynor Video at 21:25:48.)

Throughout the video, Officer Purdy's vehicle traveled relatively far behind Defendant Raynor's vehicle to the extent that it was necessary for Officer Purdy to zoom in the camera on the vehicle to capture some of Defendant Raynor's driving. (Raynor Video at 21:10:35.) At the

---

[5]     The Fort Lee Military Base falls within the jurisdiction of the Court pursuant to 18 U.S.C. § 7, and the laws of the Commonwealth of Virginia are assimilated under 18 U.S.C. § 13 or 32 C.F.R. § 634.25(f).

[6]     The video failed to capture any audio of the conservation between Officer Purdy and Defendant Raynor. (Raynor Video.)

time, vehicles were traveling in the right westbound lane adjacent to Defendant Raynor's vehicle and in the left westbound lane in front of Defendant Raynor. (Raynor Video at 21:10:10-56.) The video depicts Defendant Raynor's vehicle drifting to the right on top of the center dotted-line used to separate traffic traveling in the other lane in the same direction. (Raynor Video at 21:10:11-12.) As Defendant Raynor's vehicle drifted over to the center dotted-line, his vehicle nearly struck a vehicle traveling in the adjacent lane. (Raynor Video at 21:10:11-12.)

Immediately thereafter, Defendant Raynor's vehicle moved to the far left of his lane, touched the left fog line and then weaved within the lane. (Raynor Video at 21:10:13-34.) Officer Purdy's dash camera zoomed in on Defendant Raynor's vehicle as it drifted back towards the center line. (Raynor Video at 21:10:35.) Defendant Raynor's vehicle continued to weave within his lane. (Raynor Video at 21:10:37-53.)

After signaling with his turn signal, Defendant Raynor moved into the right lane and again drove on top of the far right fog line. (Raynor Video at 21:10:56.) Officer Purdy followed Defendant Raynor's vehicle into the right lane, where the video depicts Defendant Raynor traveling on the right fog line for approximately ten seconds. (Raynor Video at 21:11:00-11.) At this time, Officer Purdy used his emergency lights to initiate a traffic stop. (Raynor Video at 21:11:11.) After Defendant Raynor stopped his vehicle, Officer Purdy initiated a radio call to report the stop and indicated that he had "a traffic stop, it's going to be 36 westbound" and that the "reason for stop is going to be failure to maintain a lane, lane weaving, occupant unknown due to tool box and ladder blocking the rear windshield, at least on initial approach." (Raynor Radio Traffic.)

The dashboard camera depicts Officer Purdy conducting a search of Defendant Raynor and Defendant Raynor unsuccessfully completing field sobriety tests. (Raynor Video at

4

21:19:00-21:21:58.) A field breath test showed that Defendant Raynor's blood alcohol level registered at .213.[7] (Raynor Video at 21:21:41.) As a result, Defendant Raynor was charged with Driving Under the Influence of Alcohol and Failure to Maintain a Single Lane of Travel. (Raynor Criminal Information (Raynor ECF No. 1) at 1-2.) Notably, Defendant Raynor refused to undergo a blood alcohol test after his arrest. (Raynor Criminal Information at 2.)

B. Lester T. Jones

On April 5, 2013, Officer Purdy was on duty and traveling westbound in the left-hand lane on Route 36. At the time of the incident, Officer Purdy's vehicle contained a dashboard-mounted video camera. (Jones Video.) At approximately 9:43 p.m., Defendant Jones traveled westbound in the right-hand lane on Route 36. (Jones Video at 21:43:10.) The video depicts no adverse road or weather conditions and one cannot determine the race of the driver. (Jones Video at 21:43:10.) The video also shows other traffic traveling westbound in the left-hand lane next to Defendant Jones' vehicle. (Jones Video at 21:43:30.)

The video depicts Defendant Jones' vehicle driving on top of the right fog line. (Jones Video at 21:43:36.) Officer Purdy moved to the right-hand lane and traveled behind Defendant Jones. (Jones Video at 21:43:40.) Defendant Jones' vehicle then crossed over the right fog lane and began to run off the road. (Jones Video at 21:43:40-43.) Defendant Jones' vehicle then drifted back and continued driving on top of the right fog line. (Jones Video at 21:43:44-48.) After moving back to the center of his lane, Defendant Jones moved to the far left side of the lane, touching the dotted center lane line and nearly striking a vehicle traveling in the left-hand westbound lane. (Jones Video 21:44:04-07.) After Defendant Jones began to move back toward

---

[7]     In Virginia, a driver may not operate a motor vehicle while having a blood alcohol concentration of .08 percent or more. Code of Virginia § 18.2-266.

the center of his lane, Officer Purdy turned on his emergency lights to initiate a traffic stop. (Jones Video at 21:44:11.)

The audio captured on the tape reveals that, when Officer Purdy approached Defendant Jones' vehicle, the officer addressed Defendant Jones as "Sir" and conducted himself in a respectful and professional manner when speaking with Defendant. (Jones Video at 21:47:47.) Officer Purdy noticed beer spilled in the back seat of Defendant Jones' vehicle, which Defendant Jones' acknowledged to Officer Purdy. (Jones Video at 21:48:32-34.) Defendant Jones told Officer Purdy that he only had two drinks that evening. (Jones Video at 21:48:39-41.) While Defendant Jones remained in his vehicle, he unsuccessfully completed field sobriety tests — finger dexterity and counting/alphabet tests. (Jones Video at 21:52:01-21:54:32.) Officer Purdy then directed Defendant Jones to exit the vehicle. (Jones Video at 21:54:32.)

Thereafter, Officer Purdy searched Defendant Jones while another officer searched Defendant Jones' vehicle. (Jones Video at 21:54:40-21:55:20.) Defendant Jones also attempted to complete additional field sobriety tests, such as the one-legged stand. (Jones Video at 21:55:47.) Officer Purdy administered a field breath test to Defendant Jones that showed a blood alcohol content of .174 — more than twice the legal limit. (Jones Video at 22:00:57.) At this point, Officer Purdy arrested Defendant Jones for Driving Under the Influence of Alcohol and placed the defendant in the back of the officer's patrol vehicle. Officer Purdy continued to address Defendant Jones as "Sir." (Jones Video at 22:01:12-22:02:06.)

The Government ultimately charged both Defendants Raynor and Jones via information with the same offenses: Driving Under the Influence of Alcohol in violation of 18 U.S.C. § 13, assimilating the Code of Virginia §§ 18.2-266 and 18.2-270, and Failure to Maintain a Single Lane of Travel in violation of 32 C.F.R. § 634.25(f), assimilating the Code of Virginia § 46.2-

6

804. (Criminal Information (Raynor ECF No. 1; Jones ECF No. 1) at 1-2.) As to Defendant Raynor, the Government also gave notice of his refusal to submit to a blood alcohol test under 18 U.S.C. § 3118. (Raynor Criminal Information at 2.)

## II.    Standard of Review

Defendants move to dismiss the charges levied against them on the basis that Officer Purdy stopped Defendants for traffic violations due to their race — both defendants are African-American while Officer Purdy is white. (Defs.' Mot. to Dismiss at 1.) Defendants also seek discovery and an evidentiary hearing to support their claims. (Def.'s Mot. to Dismiss at 5; Defs.' Req. for Disc. at 1-2.) In doing so, Defendants largely rely on statistics offered about Officer Purdy's history of stopping vehicles during a four-month window leading up to Defendants' arrests. (Defs.' Mot. to Dismiss 1-2.)

"The burden on a party seeking to dismiss an indictment on the basis of selective prosecution is high." *United States v. Venable*, 666 F.3d 893, 900 (4th Cir. 2012). That is so, because the Executive Branch bears the responsibility of enforcing the Nation's criminal laws and possesses "broad discretion" in carrying out its duties. *United States v. Armstrong*, 517 U.S. 456, 464 (1996). "As a result, 'the presumption of regularity supports' their prosecutorial decisions and, 'in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.'" *Id.* (quoting *United States v. Chemical Foundation, Inc.*, 272 U.S. 1 (1926)). However, this discretion is "subject to constitutional constraints." *United States v. Batchelder*, 442 U.S. 114, 125 (1979).

"The equal protection component of the Fifth Amendment's Due Process Clause forbids the government from deciding to prosecute based on a defendant's race." *United States v. Olvis*, 97 F.3d 739, 743 (4th Cir. 1996). "[T]o dispel the presumption that a prosecutor has not violated

equal protection, a criminal defendant must present 'clear evidence to the contrary.'" *Armstrong*, 517 U.S. at 465 (quoting *Chemical Foundation, Inc.*, 272 U.S. at 14-15). The Court in *Armstrong* explained the reasoning behind such a high bar for defendants to move forward with selective prosecution claims:

> Judicial deference to the decisions of these executive officers rests in part on an assessment of the relative competence of prosecutors and courts. Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake. It also stems from a concern not to unnecessarily impair the performance of a core executive constitutional function. Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy.

*Id.*, 517 U.S. at 465 (citations omitted) (internal quotation marks omitted). Thus, claims such as those brought by Defendants here must be examined against this backdrop of judicial deference and the presumption of regularity that the Government holds in this area.

The Court evaluates claims of selective prosecution alleging abuse of prosecutorial discretion under "ordinary equal protection standards." *Wayte v. United States*, 470 U.S. 598, 608 (1985). Accordingly, a defendant seeking dismissal of a charge based on selective prosecution must demonstrate that a prosecution "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Id.* "To make this showing a defendant must 'establish both (1) that similarly situated individuals of a different race were not prosecuted, and (2) that the decision to prosecute was invidious or in bad faith.'" *Venable*, 666 F.3d at 900 (quoting *Olvis*, 97 F.3d at 743).

"Similarly, to obtain discovery in support of a selective prosecution claim, a defendant must produce 'some evidence' making a 'credible showing' of both discriminatory effect and discriminatory intent." *Olvis*, 97 F.3d at 743. As the Court in *Olvis* explained:

> Just as the standard for ultimately proving a selective prosecution claim is a rigorous one, so too is the evidentiary threshold for obtaining discovery from the government to support such a claim. A significant barrier to discovery is necessary because discovery imposes many of the costs present when the Government must respond to a prima facie case of selection prosecution; it diverts governmental resources and discloses prosecutorial strategies. Thus, the Supreme Court recently admonished in *Armstrong*, "the showing necessary to obtain discovery should itself be a significant barrier to the litigation of insubstantial claims."

*Olvis*, 97 F.3d at 743 (citations omitted) (internal quotation marks partially omitted). Thus, "the standard for obtaining discovery in support of a selective prosecution claim is only slightly lower than for a dismissal of the indictment; rather than presenting clear evidence, the 'defendant must produce 'some evidence' making a 'credible showing' of both discriminatory effect and discriminatory intent.'" *Venable*, 666 F.3d at 900 (quoting *Armstrong*, 517 U.S. at 470; *Olvis*, 97 F.3d at 743). Consequently, to merit discovery here, Defendants "must produce some evidence making a credible showing that (1) similarly situated individuals of a different race were not prosecuted; and (2) the decision to prosecute was invidious or in bad faith." *Id.*

Defendants are "similarly situated" when the circumstances present no distinguishable legitimate prosecutorial factors that justify making different prosecutorial decisions with respect to the defendants. *Olvis*, 97 F.3d at 744. The Fourth Circuit in *Venable* recently described the calculus:

> Generally, in determining whether persons are similarly situated for equal protection purposes, a court must examine all relevant factors . . . . [T]he district court cannot only consider the other persons' relative culpability, but must take into account several factors that play important and legitimate roles in prosecutorial decisions. Examples of such factors include: (1) a prosecutor's decision to offer immunity to an equally culpable defendant because that

9

defendant may choose to cooperate and expose more criminal activity; (2) the strength of the evidence against a particular defendant; (3) the defendant's role in the crime; (4) whether the defendant is being prosecuted by state authorities; (5) the defendant's candor and willingness to plead guilty; (6) the amount of resources required to convict a defendant; (7) the extent of prosecutorial resources; (8) the potential impact of a prosecution on related investigations and prosecutions; and (9) prosecutorial priorities for addressing specific types of illegal conduct. Our analysis of these factors is not to be conducted in a mechanistic fashion, however, because making decisions based on the myriad of potentially relevant factors and their permutations require the very professional judgment that is conferred upon and expected from prosecutors in discharging their responsibilities.

*Venable*, 666 F.3d at 901 (citations omitted) (internal quotation marks omitted).

Because the trial court must engage in the fact-driven comparison described in *Venable*, a defendant may not rely solely on statistics to establish the initial requirement of discriminatory effect. *Olvis*, 97 F.3d at 745 ("[A]bsent an appropriate basis for comparison, statistical evidence alone cannot establish any element of a discrimination claim.") As the Supreme Court in *United States v. Bass* made clear: "raw statistics regarding overall charges say nothing about charges brought against *similarly situated defendants*." 536 U.S. 862, 864 (2002). Indeed, in *Armstrong*, the Court rejected a "study" offered by the defendants, finding that the "study failed to identify individuals who were not black and could have been prosecuted for the offenses for which respondents were charged, but were not so prosecuted." *Armstrong*, 517 U.S. at 470. Thus, Defendants here must begin by identifying a specific, similarly situated person who was not stopped and given a citation despite driving in the same hazardous manner. *United States v. Hastings*, 126 F.3d 310, 315-16 (4th Cir. 1997) (finding that district court erred by ordering discovery for a selective prosecution claim where defendant failed to identify a specific, similarly situated person and merely relied on general statistics).

If a defendant succeeds in meeting his burden as to discriminatory effect, a court must then turn to whether the defendant has established discriminatory intent. For prosecutorial conduct

> to be "invidious or in bad faith," thereby reflecting discriminatory intent, the government must be more than aware that a federal prosecutorial policy may result in the prosecution of one group more than another because discriminatory intent implies that the government "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."

*Venable*, 666 F.3d at 903 (quoting *Wayte*, 470 U.S. at 610). Thus, here again, "statistical evidence of racial disparity is insufficient to infer that [the Government] in a particular case acted with a discriminatory purpose." *Olvis*, 97 F.3d at 745-46. And it bears remembering that evidence of discriminatory intent must tie directly to the Defendants' cases for they only have standing to challenge the handling of their cases. *See Hollingsworth v. Perry*, 133 S. Ct. 2652, 2659 (June 26, 2013) ("For there to be such a case or controversy, it is not enough that the party invoking the power of the court have a keen interest in the issue. That party must also have 'standing,' which requires, among other things, that it have suffered a concrete and particularized injury."); *Venable*, 666 F.3d at 904 (finding that defendant failed to offer "supporting evidence[] that the circumstances surrounding *his* arrest and indictment raise questions concerning whether the Government's decision to prosecute *him* . . . was affected by race.") (emphasis added) (internal quotation marks omitted).

A defendant seeking an evidentiary hearing on a selective prosecution claim faces the same rigorous burden as one seeking discovery. *United States v. Joya-Martinez*, 947 F.2d 1141, 1145 (4th Cir. 1991); *United States v. Richardson*, 856 F.2d 644, 647 (4th Cir. 1988). A defendant is not entitled to an evidentiary hearing as a matter of right; instead, the need for a hearing is a matter left to the discretion of the district court. *Richardson*, 856 F.2d at 647.

Because, as defense counsel conceded during oral argument, Defendants cannot point to any similarly situated white drivers who were not stopped by Officer Purdy, and during both of these stops — which were captured on video tape — Officer Purdy conducted himself in a respectful and professional manner without any racial animus towards Defendants, the Court finds that Defendants have failed to meet their burden.

### III. Analysis

Against this backdrop, the Court turns to the merits of Defendants' claims, which largely rely on statistics related to records of Officer Purdy's traffic stops during a four-month window from December 31, 2013 to April 21, 2013, during which Officer Purdy made 27 traffic stops of which 25 of the stops involved African-American drivers. (Defs.' Mot. to Dismiss at 1.) Having considered Defendants' submissions, the Court finds that Defendants have failed to meet their weighty burden to establish both discriminatory effect and discriminatory intent.

### A. Discriminatory Effect

To establish discriminatory effect, Defendants first must identify similarly situated individuals of a different race who were not prosecuted. *Venable*, 666 F.3d at 900. Yet, nowhere in their many papers do Defendants identify *any* similarly situated individual of a different race — a white driver who drove in a similarly dangerous manner as Defendants — who was not prosecuted. Indeed, during oral argument, defense counsel conceded that the defense lacked the ability to point to a similarly situated person not prosecuted:

> The Court: Mr. Wagner, I will ask you one more time. Who is the white person who was similarly-situated that was not stopped?
>
> Mr. Wagner: I don't have a white person to present to The Court who was not stopped for failing to maintain —

\*      \*      \*      \*      \*      \*      \*      \*

Mr. Wagner:   I am answering your question, no, we don't have that —

The Court:   Okay.

Mr. Wagner:   — white person.

(Tr. at 11, 12.)[8] Indeed, the only white driver referenced in Defendants' papers, Robert Carr, was stopped for failing to yield to an emergency vehicle and was given a citation that he did not contest, which certainly undermines the notion that Officer Purdy only enforced the law against African-Americans. (Defs.' Reply (Raynor ECF No. 25; Jones ECF No. 16) at 8.)

Defendants' inability to cite to a single similarly situated white person who was not prosecuted must prove fatal to their motions. As previously detailed, the Supreme Court in *Armstrong* and the Fourth Circuit in *Venable, Hastings* and *Olvis* made clear that a defendant must be able to point to a specific similarly situated person who was treated differently than the defendant. *Armstrong*, 517 U.S. at 470; *Venable*, 666 F.3d at 901; *Hastings*, 126 F.3d at 315-16; *Olvis*, 97 F.3d at 745. This requirement flows from the need for the Court to engage in the comparison between Defendants' cases and the similarly situated person as delineated in *Venable*, 666 F.3d at 901. For this very reason, the Fourth Circuit in *Hastings* reversed the district court's order granting discovery and held that the defendant was not entitled to discovery on his selective prosecution claim, finding that the defendant was "unable to show that *any* other person not prosecuted has *any* of the characteristics [similar to the defendant's case] . . . . [Therefore, the defendant had] not satisfied what is supposed to be a substantial evidentiary burden." *Hastings*, 126 F.3d at 315-16.

Lacking a single similarly situated person not stopped and charged by Officer Purdy, Defendants turn to statistical evidence that they say establishes the discriminatory effect.

---

[8]      "Tr." refers to the transcript from the oral argument on October 4, 2013.

Specifically, Defendants argue that a four-month window of Officer Purdy's arrests — between December 31, 2012 and April 23, 2013 — shows that the officer stopped 27 vehicles, which involved 25 African-American drivers, one Latino driver and one white driver. (Defs.' Mot. to Dismiss at 1.)[9] Defendants couple this information with a "study" performed by interns from the Office of the Federal Public Defender and a statistical analysis that Defendants provided in their reply brief to reach a conclusion that Officer Purdy targeted African-Americans for traffic stops. (Defs.' Mot. to Dismiss at 2 n.1; Defs.' Reply at 8-9, 11-13.) Defendants' argument must fail for numerous reasons.

First, the Supreme Court has repeatedly held that a defendant cannot meet his weighty burden to establish discriminatory effect by relying solely on statistics. *Bass*, 536 U.S. at 864 ("[R]aw statistics regarding overall charges say nothing about charges brought against *similarly situated defendants*."); *Armstrong*, 517 U.S. at 470 ("[The defendants'] study did not constitute some evidence tending to show the existence of the essential elements of a selective-prosecution claim.") (internal quotation marks omitted). And the Fourth Circuit has consistently followed the Supreme Court's holding. *Venable*, 666 F.3d at 903 ("[A]bsent an appropriate basis for comparison, statistical evidence of racial disparity alone cannot establish any element of a discrimination claim."); *Hastings*, 126 F.3d at 316 (same); *Olvis*, 97 F.3d at 745 (same). Indeed,

---

[9]     Defendants received data pertaining to Officer Purdy's traffic stops from September 21, 2012 to May 25, 2013, from the United States Attorney's Office. (Defs.' Mot to Dismiss at 1.) Defendants assert that, because the United States Attorney's Office voluntarily provided this information, the Government has waived its ability to contest production of additional discovery. (Defs.' Reply at 2.) Defendants provide no authority for their position. The Court believes that waiver does not apply here and, therefore, rejects Defendants' invocation of the concept. *See United States v. Fort*, 472 F.3d 1106, 1120-21 (9th Cir. 2007) (Government's production of redacted reports did not waive protections of Fed. R. Crim. P. 16).

this Court is unaware of any authority to the contrary.[10]

It bears repeating that, even using Defendants' statistics, Officer Purdy did stop a white driver, Robert Carr, and issued him a citation, albeit for different criminal conduct. (Defs.' Reply at 8.) Had race driven Officer Purdy's enforcement decisions, he could have released Carr without issuing him a citation after stopping Carr and realizing that he was white. That may have provided a similarly situated person that was treated differently than Defendants, but the opposite occurred. Consequently, the citation given to a white driver further undermines Defendants' position.

Second, Defendants cherry-picked a statistical time frame to suit the conclusion that they wanted to reach — that Officer Purdy stopped vehicles due to the race of the driver. The Government provided information to the defense about Officer Purdy's traffic stops since he began working at Fort Lee on September 21, 2012 until May 25, 2013. Had Defendants looked at the entirety of this time period, the statistics would have shown that 69% of the vehicles stopped by Officer Purdy were driven by African-Americans — a percentage significantly below the racial composition of nearby Petersburg, Virginia. (Gov.'s Response "Gov.'s Mem." Raynor ECF No. 22; Jones EFC No. 13) at 7.) Or, if the focus had been placed on the first four months of this time period, the statistics would have revealed that Officer Purdy's traffic stops involved 56% white drivers and only 30.4% African-American drivers. (Gov.'s Mem. at 16.) During oral argument, defense counsel could provide no explanation other than the statistical benefits for

---

[10]     During oral argument, the Court pressed defense counsel to identify *any* case that supports the proposition that statistics alone could meet a defendant's burden regarding discriminatory effect. Defense counsel could only point to *United States v. Aguilar*, 883 F.2d 662 (9th Cir. 1989). (Tr. at 12-13.) However, *Aguilar* does not stand for this proposition. To the contrary, the Ninth Circuit in *Aguilar* denied the defendants' selective prosecution claim, because the defendants failed to specifically identify a similarly situated group of law breakers. *Aguilar, 883* F.2d at 706-08.

their argument for the defense's focus on the time period of December 31, 2012 to April 23, 2013. (Tr. at 15-16.)

Third, Defendants' statistical conclusion relies heavily on a flawed study performed by interns of the Office of the Federal Public Defender. Defendants offered no evidence that the interns possessed any expertise in statistical collection or any training in this area. (Tr. at 25.) Moreover, the interns actually collected information from an area not within the confines of Fort Lee. (Tr. at 25.) And the interns collected the information at a time earlier in the day than the traffic stops at issue (which occurred at night), presumably to allow the interns to have a better opportunity to observe the race of the drivers. (Gov.'s Mem. at 7-8.) Due to the serious scientific flaws in the study conducted on behalf of Defendants, the Court as the fact-finder here gives no weight or credibility to the results of the study.

Finally, Defendants offer a statistical conclusion from Dr. D'Arcy Mays, who rendered an opinion based on the previously mentioned study that was conducted by the interns of the Office of the Federal Public Defender. (Defs.' Reply at 8.) Because Dr. Mays' opinion relies on the flawed study conducted by the interns, his opinion necessarily founders. Moreover, it focuses only upon the four-month time period selected by Defendants. (Defs.' Reply at 8.) And Dr. Mays' opinion provides very little basis for his opinion (Defs.' Reply at Ex. 3), which further diminishes its value. *See Zenith Elec. Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) ("An expert must offer good reason to think that his approach produces an accurate estimate using professional methods.") (internal citations omitted). Therefore, the Court gives no weight to Dr. Mays' opinion.

In sum, the Court finds that Defendants' have utterly failed to meet their burden of putting forth "some evidence" making a "credible showing" of discriminatory effect. *Olvis*, 97

F.3d at 743. This finding alone must result in a denial of Defendants' motions. However, the Court will also examine whether Defendants have offered "some evidence" making a "credible showing" of discriminatory intent. *Olvis*, 97 F.3d at 743.

### B. Discriminatory Intent

The Court begins the analysis of the existence of discriminatory intent with a point that the parties have glossed over: the discriminatory intent must relate to the stops of Defendants for Defendants to be entitled to relief. Although Defendants' discussion of other stops and statistics may serve as circumstantial evidence, it must be tied in some manner to Defendants' cases. *Venable*, 666 F.3d at 904. Indeed, defense counsel acknowledged this burden during oral argument. (Tr. at 23.) In this Court's view, two facts undermine Defendants' argument that Officer Purdy acted with "invidious or bad faith."

First, Defendants have offered no evidence that Officer Purdy was aware of the race of the drivers of their vehicles at the time of their stops. Both traffic stops occurred at night and the videotapes of the stops show that one cannot tell the race of either driver during the stops of Defendants. Defendant Raynor's truck carried a toolbox and a ladder that obstructed the view of the cabin of the truck. (Raynor Video at 21:10:10.) Indeed, one cannot tell that Defendant Raynor carried a passenger until the passenger stepped out of the truck. (Raynor Video at 21:25:48.) The darkness also prevented Officer Purdy from knowing the race of the driver of Defendant Jones' vehicle. Consequently, based on the evidence that has been tendered by the parties, the Court finds as a fact that Officer Purdy was unaware of the race of the drivers of Defendants' vehicles until after the officer stopped their vehicles.

Second, both of these traffic stops were captured on videotape. Audio also exists for the stop of Defendant Jones. Additionally, radio traffic of both stops exists. In short, we know what

17

happened during these two traffic stops and there is no evidence during either stop of any racial animus by Officer Purdy. To the contrary, the evidence shows that Officer Purdy acted in a highly professional and respectful manner during both traffic stops. Indeed, defense counsel conceded this important fact during oral argument. (Tr. at 19-20, 24.) Furthermore, Defendants have not offered any affidavits — either from themselves or from Defendant Raynor's passenger or from anyone else — alleging that Officer Purdy made any racially disparaging comments to either Defendant Raynor or Defendant Jones. Consequently, the Court finds as a matter of fact that, during the stops of both Defendants, Officer Purdy conducted himself with the utmost professionalism and respect to both Defendants, making no racially offensive comments or exhibiting any other conduct that indicated that the traffic stops were racially motivated.

In an attempt to meet their burden regarding discriminatory intent, Defendants again turn to their statistics. However, the courts have made clear that statistics alone cannot establish discriminatory intent. *See e.g.*, *Venable*, 666 F.3d at 903. Moreover, the Court has already determined factually that Defendants' statistics are flawed and unworthy of any reliance. Thus, the Court finds no value in Defendants' statistics in assessing Officer Purdy's intent.

In addition to their statistics, Defendants offer anecdotal information from other traffic stops. The majority of this information constitutes the subjective views of those stopped, which offers no value to the analysis at hand.[11] *Hastings*, 126 F.3d at 315 (defendant's subjective views that his prosecution was motivated by discrimination or unconstitutional considerations failed to satisfy his burden of proof); *see also Davis v. Fleet Funding Corp.*, 884 F.2d 1387, 1387 (4th Cir. 1989) (finding that a plaintiff's perceptions are not enough to establish discrimination);

---

[11]     Notably, the following drivers cited by Defendants pled guilty in their cases without filing any motions alleging that their arrests were racially motivated: Kimberly Reed, Sr. (3:13mj130), Abel Hernandez (3:13mj98), Latosha Anderson (3:13mj34) and Thaddeus Robertson (3:13mj184).

*Elliot v. Group Medical & Surgical Serv.*, 714 F.2d 556, 567 (5th Cir. 1983) ("We are not prepared to hold that a subjective belief of discrimination, however genuine, can be the basis of judicial relief."). Absent any objective evidence that Officer Purdy acted on the basis of their race, the other drivers' subjective beliefs of discrimination cannot establish discriminatory intent.

An allegation regarding Kimberly Reed, Sr., merits additional discussion. In their reply memorandum, Defendants assert that, during a traffic stop of Mr. Reed, Sr., Officer Purdy referred to Mr. Reed, Sr., as "boy" — an unacceptable racial slur — on repeated occasions. (Defs.' Reply at 4-5.) An officer's use of a racial epithet may constitute "strong evidence that a comment or action is racially motivated." *Williams v. Bramer*, 180 F.3d 699, 706 (5th Cir. 1999). However, such a comment — regardless of how offensive the comment was — must be tied to Defendants' cases in some manner to have any relevance here. And as detailed above, all parties concur with the Court's factual finding that the evidence from the traffic stops of Defendants show that Officer Purdy acted with the utmost professionalism and respect for Defendants, repeatedly referring to Defendants as "Sir." (Tr. at 24.) The Court believes that Officer Purdy's conduct during the stops of Defendants' vehicles undermines any relevance of the officer's purported slur to Mr. Reed, Sr., regardless of how offensive the comment was.

Moreover, there is serious doubt as to whether Officer Purdy actually made the slur to Mr. Reed, Sr. Notably, the evidence regarding the slur has been submitted by Defendants in the form of an affidavit from an investigator from the Office of the Federal Public Defender, not in an affidavit from Mr. Reed, Sr. (Defs.' Reply at Ex. 1.) And the investigator interviewed Mr. Reed, Sr., the day after his son, Kimberly Reed, Jr. (who remains a fugitive), was arrested by Officer Purdy. (Gov.'s Resp. to Ct.'s Order of Oct. 7, 2013 (Raynor ECF No. 40; Jones ECF No. 22) at 2.) Further, in response to the Court's Order dated October 7, 2013, the Government

supplied a copy of the videotape from the dashboard camera for the stop of Mr. Reed, Sr. (Gov.'s Resp. to Ct.'s Order of Oct. 7, 2013 at Ex. 1.) The videotape does not support the allegations in the sworn statement of the investigator. And although only a portion of the stop was captured on audio tape, the alleged racial slur cannot be heard on the tape. Further, the tape reveals that another officer actively participated in a majority of the traffic stop and no evidence has been submitted that indicates that the other officer heard any racial slur. Finally, and notably, the Government indicates that not only did Mr. Reed, Sr., not file a complaint against Officer Purdy, but Officer Purdy filed a complaint *on Mr. Reed, Sr.'s behalf* about the slow response by medical personnel to treat Mr. Reed, Sr. — hardly the act of the racially motivated police officer described by Investigator McGrew. (Gov.'s Resp. to Ct.'s Order of Oct. 7, 2013 at 2, Ex. 3.) For these reasons, the Court finds little credence in the allegations about Officer Purdy's conduct during the stop of Mr. Reed, Sr.

Defendants also assail Officer Purdy's overall credibility by attacking his testimony during suppression hearings conducted by this Court in two other unrelated cases. First, in *United Stated v. Williams*, 2013 WL 1975669, at *2 (E.D. Va. May 13, 2013), Defendants assert that Officer Purdy's testimony amounted to perjury. In *Williams*, the defendant was charged with driving under the influence of alcohol after Officer Purdy observed the defendant driving on the fog line and drifting within his lane. During the hearing, Officer Purdy described his law enforcement experience and noted that he had stopped 20 drivers on Route 36 for driving in a manner similar to Williams and that during those stops, 18 were indeed found to be driving under the influence. (Defs.' Req. for Disc. Ex. 1 at 14-17, Ex. 4.) Defendants submit that only 14 defendants were charged with driving under the influence and some of those were charged with driving under the influence of narcotics rather than alcohol, while six of those cases were

dismissed. (Defs.' Req. for Disc. Ex. 1 at 14-17, Ex. 4.) However, the distinction between a driver's use of alcohol or narcotics when charged with driving under the influence is irrelevant, as the Code of Virginia provides that driving while intoxicated includes "any narcotic drug or any other self-administered intoxicant or drug." Code of Virginia § 18.2-266. And the subsequent dismissal of six of these cases does little to undermine Officer Purdy's credibility, as the prosecutor may have relied on numerous reasons to exercise his or her discretion not to prosecute the cases.

Defendants also point to the Court's extensive questioning of Officer Purdy during the suppression hearing in *United States v. Otis Prosise*, case number 3:13mj138, as a sign that the Court "did not find his testimony was credible" in that case. (Defs.' Req. for Disc. at 5.) This assertion is simply not correct and falsely attempts to create a finding that this Court never made. The Court as the fact-finder during a suppression hearing commonly asks questions of witnesses to assess credibility, not because the Court has already reached a conclusion as to credibility. In short, the Court never rendered a finding on Officer Purdy's credibility during the *Prosise* suppression hearing and nothing should be drawn from the Court's questions.[12]

---

[12] Defendants also suggest an inference of problems with Officer Purdy's credibility by stating: "Prior to the Court making findings in the *Prosise* matter, the government moved to dismiss all charges against the defendant." (Defs.' Req. for Disc. at 7.) But this assertion fails to tell the full (and accurate) story. After Officer Purdy's testimony during the suppression hearing, the defendant testified. At the conclusion of his testimony, the prosecutor elected not to ask the defendant any questions. As it did with Officer Purdy, the Court then asked the defendant some questions, which drew objections from both defense counsel and the prosecutor, who both wrongly believed that the Fifth Amendment precluded cross-examination of a defendant during a suppression hearing. *See Simmons v. United States*, 390 U.S. 377, 394 (1968) (defendant who testifies during a suppression hearing has his Fifth Amendment rights protected by precluding subsequent use of his testimony against him at trial). The prosecutor (a military lawyer appearing before the Court as a Special Assistant United States Attorney) then dismissed the charges, acting on her mistaken understanding of this legal issue, not due to any concerns with Officer Purdy's testimony. Consequently, the dismissal in the *Prosise* matter resulted from the mistakes of the prosecutor, not from any missteps by Officer Purdy.

Having reviewed the information submitted by Defendants on the issue of intent, the Court concludes that Defendants have failed to offer evidence that Officer Purdy stopped these two defendants due to their races. To the contrary, the evidence shows that Officer Purdy stopped Defendants due to their dangerous driving that resulted from their significant intoxication. Moreover, during both traffic stops, Officer Purdy treated Defendants with the utmost respect and acted with professionalism, which defense counsel conceded during oral argument. Thus, Defendants have also failed to meet their burden of proof as it relates to discriminatory intent.

## IV.    Conclusion

Defendants have raised serious allegations against a federal police officer. This Court has exhaustively reviewed the record and conducted oral argument. After having done so, the Court concludes that Defendants have failed to meet their burden of proof as to both discriminatory impact and discriminatory intent. Therefore, Defendants' Request for Discovery and Motion to Dismiss are DENIED.

Let the Clerk file this Opinion electronically and notify all counsel accordingly.

_____ /s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Dated: October 24, 2013